UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LISA FLUELLEN**,                                  Case Number 1:12 CV 719

     Plaintiff,                                  Judge Benita Y. Pearson

     v.                                          REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

     Defendant.                                  Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Lisa Fluellen filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income (SSI) and disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

On June 22, 2009, and July 8, 2009, Plaintiff filed applications for DIB and SSI, claiming she was disabled due to fibromyalgia, depression, and headaches. (Tr. 191-97, 191-200, 245). She alleged a disability onset date of May 10, 2009. (Tr. 167, 174). Her claims were denied initially and on reconsideration. (Tr. 148-51). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 7). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ concluded Plaintiff could perform a reduced range of light work and found she was not disabled within the meaning of the Act. (*See* Tr. 9, 16, 21, 27). The Appeals

Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On March 25, 2012, Plaintiff filed the instant case. (Doc. 1).

### FACTUAL BACKGROUND

Personal and Vocational History

Plaintiff, a nurse with a masters degree, was 42 years old on the date of ALJ hearing. (Tr. 63). Plaintiff's past relevant work included nurse, nurse supervisor, travel nurse, nursing professor, and nurse coordinator, which entailed managing care for cancer patients. (Tr. 38-41). After her alleged onset date, Plaintiff enrolled in a Ph.D. oncology program but dropped out due to her health. (Tr. 36-37, 64). Subsequently, she accepted a nursing position for three weeks but also dropped out for health reasons. (Tr. 36-37, 64). Plaintiff testified she could not return to work because it was "physically too taxing" and "the pain was exhausting". (Tr. 42). Plaintiff said it was difficult to work a full day "because of all the walking [and] alertness needed as a nurse." (Tr. 254).

Concerning daily activity, Plaintiff said she generally woke around 8:00 a.m. or 9:00 a.m., ate breakfast, did stretching exercises and laundry, dusted, and made her bed. (Tr. 59-61, 253). In the afternoon or evenings, Plaintiff walked a mile for exercise and watched television.  (Tr. 46, 59-61, 253).  She prepared her own meals, went grocery shopping, drove independently, and occasionally watched her friends' dogs. (Tr. 253-56). Plaintiff also did home physical therapy exercises and swam. (Tr. 46).  Plaintiff later reported she had difficulty laying down, sitting, and standing, and said she was "unable to perform activities of daily living." (Tr. 280). She said she suffered from headaches daily, as well as pain in her hips and shoulders. (Tr. 281).

Concerning social activity, Plaintiff reported she watched television or walked with others

2

a "couple times a week." (Tr. 257). When asked to describe changes in social activity since her illness, Plaintiff said she was unable to travel and play sports, but could occasionally attend a sporting event. (Tr. 258, 288).

On March 19, 2009, Plaintiff was sent to Dr. Vinya Vallabhaneni for a fit-to-work evaluation after receiving three corrective actions in four work days. (Tr. 400). Plaintiff's supervisor emailed Dr.Vallabhaneni about Plaintiff's behavioral changes, such as her inability to focus and keep her eyes open, slow gait, and slurred speech. (Tr. 400). Plaintiff denied depression but said she had insomnia. (Tr. 401). Dr. Vallabhaneni diagnosed substance abuse, depression, side effects from medication combination, and insomnia. (Tr. 402). She ordered a drug screen to rule out substance abuse but Plaintiff resisted, stating she had taken Vicodin. (Tr. 402, 431). Dr. Vallabhaneni found Plaintiff could return to work without restrictions but instructed Plaintiff to take only Ativan while she was working. (Tr. 402). She also told Plaintiff to see a psychiatrist and follow-up in the next month regarding her treatment plan. (Tr. 402). Plaintiff's supervisor sent her back to Dr. Vallabhaneni the next day because she was lethargic, drowsy, and had trouble focusing on the job. (Tr. 403). Dr. Vallabhaneni again spoke with Plaintiff about medication combination causing drowsiness and instructed Plaintiff take only Ativan while working. (Tr. 403). Plaintiff admitted to taking a combination of medicine – Cymbalta and Lyrica – before work that morning, which she usually did not do. (Tr. 403). She denied depression or suicidal ideation. (Tr. 403). Dr. Vallabhaneni diagnosed drowsiness from medication combination, instructed Plaintiff to take three days off work, and attempted to order Plaintiff a cab, but Plaintiff refused and left on her own. (Tr. 404).

Fibromyalgia

On December 19, 2008, Dr. Lubetsky diagnosed fibromyalgia based on tender points and

complaints of multi-joint pain. (Tr. 370-71). X-rays of her knees and hips were normal. (Tr. 372). Dr. Lubetsky prescribed Flexeril and instructed Plaintiff to follow-up. (Tr. 372).

In May 2009, Plaintiff began treatment with rheumatologist Luis Torregrosa, M.D., for fibromyalgia management. (Tr. 378). Dr. Torregrosa diagnosed Plaintiff with fibromyalgia after noting tender points on her cervical and lumbar spines, anterior chest wall, medial aspects of both knees, lateral epicondyles, and trochanter regions of both hips. (Tr. 379). One month later, Dr. Torregrosa reported Plaintiff had about "50% bad days" on her regimen of Lyrica, Flexeril, Cymbalta, and Vicodin as needed. (Tr. 376). In a letter dated July 15, 2009, Dr. Torregrosa terminated his treatment relationship with Plaintiff because she called her pharmacy and attempted to obtain a fraudulent prescription for Norco in Dr. Torregrosa's name. (Tr. 413). Dr. Torregrosa wrote, "It is clearly evident that this [was] a fraudulent prescription called in my name, which is an action and behavior on your part that I simply cannot tolerate." (Tr. 413). At the ALJ hearing, Plaintiff denied calling in the prescription in Dr. Torregrosa's name but said she did not pursue the matter because she was moving. (Tr. 44-45).

Plaintiff began treatment with primary care physician Christine Antenucci, M.D., in November 2009, after relocating from Michigan to Ohio. (Tr. 516). Dr. Antenucci prescribed medication, but indicated she would not prescribe any more medication until Plaintiff saw a rheumatologist. (Tr. 517). The next month, Plaintiff began treatment with Stanley Ballou, M.D., and complained of pain but said her current regime of medication and exercise controlled her symptoms. (Tr. 510). Plaintiff's gait was normal and a general physical exam was unremarkable. (Tr. 514). Dr. Ballou found her history consistent with fibromyalgia but preferred she take Tramodol as opposed to Vicodin, because Vicodin was not effective for fibromyalgia. (Tr. 514). Nevertheless, in February

4

of 2010, Plaintiff began treating with internist Dr. Brenda Smith, reported chronic pain issues, said Vicodin helped, and was prescribed Vicodin for pain. (Tr. 481).

On March 1, 2010, Plaintiff's physical therapist Barbra Tingley noted Plaintiff exercised three to four times per week and her pain was better. (Tr. 477). Plaintiff returned to Dr. Smith on April 9, 2010 and reported she was having a bad week pain-wise despite working out at Curves three to four times a week. (Tr. 470). On April 20, 2010, Plaintiff saw Dr. Smith after having a fibromyalgia flare-up the prior week. (Tr. 469). She said the pain started in her hips and became so bad she could barely walk. (Tr. 469). Dr. Smith adjusted Plaintiff's medication and noted her pain was alleviating. (Tr. 469).

George Gelehrter, M.D. evaluated Plaintiff for pain management on April 26, 2010. (Tr. 465). Plaintiff reported taking elective classes for her Ph.D program that would start in the fall. (Tr. 465). She also said she worked out at Curves, a gym, three times a week. (Tr. 466). Dr. Gelehrter found Plaintiff was functional with flares of fibromyalgia symptoms. (Tr. 467). He recommended continued exercise and said it was reasonable to prescribe Percocet for pain on worse days. (Tr. 467).

On June 21, 2010, Plaintiff returned to Dr. Smith and reported headache pain. (Tr. 460). Dr. Smith noted Plaintiff's fibromyalgia was managed with medication and a continued work out plan. (Tr. 460).

Plaintiff saw Dr. Gelehrter on September 13, 2010 and reported she had been taking Oxycontin daily and it helped her pain. (Tr. 568). He noted Plaintiff was "doing better in general" and remained active in the Curves exercise program. (Tr. 569). A month later, Plaintiff returned complaining of a fibromyalgia flare-up. (Tr. 549). Plaintiff requested and was prescribed Oxycontin.

5

(Tr. 549-50).

Plaintiff returned to Dr. Smith on January 26, 2011, and reported she accepted a part-time job and planned to take tai-chi classes. (Tr. 546). She noted Plaintiff was feeling better and prescribed headache medication. (Tr. 547).

In March 2011, Plaintiff experienced pain she described as a fibromyalgia flare-up and presented to the emergency room. (Tr. 540). Two weeks later, Dr. Gelehrter examined Plaintiff and noted Plaintiff's fibromyalgia/depression was "doing quite well overall". (Tr. 540). Dr. Gelehrter also reported Plaintiff's response to medication was sub-optimal. (Tr. 540). Plaintiff said she lost her job due to fibromyalgia. (Tr. 540).

On July 28, 2011, Dr. Smith indicated in a letter written "To Whom It May Concern," that Plaintiff was unable to work or complete her Ph.D. program due to multiple absences or an inability to complete her work due to fibromyalgia. (Tr. 599). Dr. Smith noted, "[Plaintiff] is well educated and wants to work and has been frustrated by her inability to hold down a job." (Tr. 599). That same day, Dr. Smith assessed Plaintiff's functional limitations on a functional capacity assessment form. (Tr. 601-02). Dr. Smith found Plaintiff could lift ten pounds maximum, stand/walk for one hour and sit for one hour in an eight-hour work day; was completely unable to stoop due to back pain; had significant manipulative limitation due to wrist cramps and an inability to elevate her left arm fully; and could never reach with her left arm or reach above shoulder level with her right arm. (Tr. 601-02).

Migraine Headaches

Neurologist Amy Kodrick D.O., evaluated Plaintiff in January and February 2009. (Tr. 364-70). Plaintiff reported a history of headaches but said they had increased in frequency and severity

6

six months prior to this evaluation. (Tr. 364). Plaintiff's past medication included Elavil, Topamax, Neurotonin, Flexeril, Effexor, Zonegram, Cymbalta, and Lyrica. (Tr. 364). She was taking Vicodin daily when she met with Dr. Kodrick on January 27, 2009. (Tr. 364). Dr. Kodrick diagnosed mixed headache syndrome with components of musculoskeletal and migraine with aura. (Tr. 364). She also concluded there was a component of rebound cephalgia with overuse of analgesic medication. (Tr. 366). Dr. Kodrick ordered an MRI, instructed Plaintiff to keep taking Flexeril, and prescribed Cymbalta for fibromyalgia and headache prevention, Axert for headache onset, and physical therapy to reduce paracervical tightness. (Tr. 366-67). At a follow-up visit, Plaintiff reported some relief with anti-inflammatories, minimal relief with Cymbalta, and no relief with Axert. (Tr. 368). On examination, Plaintiff was awake and alert with full strength in her upper and lower extremities, sensation intact, and normal gait, and 2/4 deep tendon reflexes at the biceps, triceps, brachioradialis, patella, and achilles. (Tr. 369). Since Plaintiff cancelled her MRI appointment, Dr. Kodrick ordered another MRI and prescribed Lyrica for use at bedtime. (Tr. 369). Plaintiff's MRI dated March 14, 2009 was normal. (Tr. 354).

Depression

Plaintiff went to Shelly Galasso Bonanno, MA, LLP, for a psychological evaluation on September 17, 2009. (Tr. 426-36). She reported she had suffered from fibromyalgia symptoms for seven years and migraine headaches for 20 years. (Tr. 430). When describing her fit-to-work evaluation with Dr. Vallabhaneni, Plaintiff said she "lost a week" and did not know what happened. (Tr. 431). She admitted she did not follow-up with a psychiatrist or take a drug test as requested. (Tr. 431). Plaintiff reported symptoms of anxiety and depression but said she got along well with others. (Tr. 431-32). She said she lived with her mother and significant other and performed household

chores, but they took longer than they used to. (Tr. 432). Ms. Bonanno found Plaintiff motivated, her self-esteem fair, insight limited, and mental activity spontaneous but organized. (Tr. 433). She diagnosed Plaintiff with depressive and anxiety disorders, provisional opiate dependancy, and said Plaintiff's prognosis appeared fair. (Tr. 435). She assessed Plaintiff's global assessment of functioning (GAF)  score was 54[1]. (Tr. 435).

In January 2010, Plaintiff's primary care physician referred Plaintiff to Nurse Snider-Fuller for a mental health evaluation due to Plaintiff's medicine combination. (Tr. 500). Plaintiff reported she was angry and frustrated about living with her mother after breaking up with her boyfriend, having no income, being in pain, and having medications changed by her doctors. (Tr. 501). She said she quit her job after termination was threatened due to missing work. (Tr. 501). Plaintiff was cooperative, had fair judgment and insight, poor memory, and distractible attention span and concentration. (Tr. 503). Nurse Snider-Fuller diagnosed depressive and anxiety disorders, assessed a GAF score of 51–60, but said Plaintiff was a "people person" and a "go-getter". (Tr. 503).

Plaintiff returned to Nurse Snider-Fuller on March 4, 2010, and reported her pain was under control with exercise and physical therapy. (Tr. 473). On May 10, 2010, Plaintiff said she "was doing okay" but her long-term relationship was officially over. (Tr. 462). Although Plaintiff said her pain was 10/10 due to fibromyalgia, she informed Nurse Snider-Fuller she was going on vacation with friends. (Tr. 462). Nurse Snider-Fuller noted her mood was fairly good. (Tr. 462).

---

1. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

On June 17, 2010, Plaintiff returned to Nurse Snider-Fuller for medication management. (Tr. 457). Plaintiff said she went out for her birthday, rode a mechanical bull, lasted 15 seconds before being thrown off, and was a bit sore from the activity. (Tr. 457). Plaintiff also said she had been going out with friends more. (Tr. 457). Nurse Snider-Fuller noted Plaintiff was "enjoying life more" but still grieving the end of her prior relationship. (Tr. 457). Plaintiff said she wanted to be in school but her fibromyalgia flare-ups  prevented her from enrolling. (Tr. 457). At the time, Plaintiff reported her pain was 4/10 in her hips and thighs. (Tr. 458). Nurse Snider-Fuller assessed a GAF score of 60-63[2]. (Tr. 458).

Ms. Snider-Fuller completed a Medical Assessment of Ability to do Work-Related Activities on July 30, 2010. (Tr. 536-38). She rated Plaintiff's ability to deal with work stresses and maintain attention/concentration as "poor or none". (Tr. 537). She also found Plaintiff's ability was poor or none in the areas of understanding, remembering, and carrying out complex job instructions, understanding, remembering, and carrying out detailed, but not complex job instructions, behaving in an emotionally stable manner, and demonstrating reliability. (Tr. 538). Snider-Fuller rated Plaintiff's abilities to follow work rules, function independently, and understand, perform, and carry-out simple job instructions as good. (Tr. 538). She specifically noted Plaintiff had worked at a "very high level in the past" but her concentration, organization, and memory had since deteriorated. (Tr. 538).

Plaintiff continued treatment with Nurse Snider-Fuller in 2010 and 2011. (Tr. 576).

---

2. A GAF score of 61–70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV-TR*, at 34.

Generally, Plaintiff's mood was fair or good. (Tr. 576, 582, 585, 592). Plaintiff's mood was poor, however, when she reported quitting her full time job due to pain from fibromyalgia. (Tr. 579, 588).

In July 2011, Nurse Snider-Fuller completed a second checkmark functional capacity assessment but this time found Plaintiff had an unlimited/good ability to deal with the public; a good ability to understand, remember, and carry out simple instructions; a fair ability to understand, remember, and carry out detailed but not complex job instructions; but poor to no ability to follow work rules, use judgment, deal with work stresses, and maintain attention and concentration. (Tr. 604-05). Nurse Snider-Fuller noted Plaintiff's recent unsuccessful employment attempt, further noting Plaintiff was unable to handle even minor issues, which represented new behavior. (Tr. 604). Toni Johnson, M.D., also signed this assessment. (Tr. 605).

State Agency Medical Reviewers

On August 24, 2009, state agency reviewer Dr. Amy Schlag reviewed Plaintiff's medical records and concluded Plaintiff could perform light exertional work with no more than occasional climbing of ramps or stairs; no climbing ladders, ropes, or scaffolds; no more than frequent balancing, stooping, kneeling, and crawling; and no concentrated exposure to hazards like working with machinery or at heights. (Tr. 419-22).

On reconsideration, state agency physician Nick Albert, M.D., reviewed Plaintiff's file and concurred Plaintiff was not disabled, noting a progress note wherein Plaintiff reported she was sore after riding a mechanical bull. (Tr. 150-51, 535). When questioned by the ALJ about the bull ride, Plaintiff said it was her birthday and she was only on it a few seconds before being thrown off. (Tr. 43-44).

On September 28, 2009, state reviewing physician Dr. Thomas Tsai found Plaintiff could

perform unskilled work. (Tr. 453). He specifically concluded Plaintiff was able to understand, carry out, and remember simple instructions; respond appropriately to supervisors, co-workers, and work situations; and deal with most changes in routine work settings. (Tr. 453). He also found Plaintiff had no problems with attention or concentration to perform simple tasks on a routine and regular basis. (Tr. 453). Dr. Tsai's assessment was affirmed on July 1, 2010 by Catherine Flynn, Psy. D. (Tr. 533).

Evidence Submitted to the Appeals Council

On September 1, 2011, the date of the ALJ's unfavorable decision, Plaintiff was voluntarily admitted to Northcoast Behavioral Healthcare for severe depression and suicidal ideation. (Tr. 609). Plaintiff reported her depression was compounded by living with her mother, the fact her former fiancé married someone else days earlier, and her pain from fibromyalgia. (Tr. 609). Plaintiff tested positive for benzodiazepines and opiates and admitted to accidentally overdosing in March 2011. (Tr. 609-10). Plaintiff "improved very rapidly and uneventfully" after receiving Wellbutrin, and continued Seroquel and Fluoxtine. (Tr. 610). She became cheerful and much brighter, achieved a full range of affect, and became interactive with staff and other patients. (Tr. 610). Plaintiff was "very invested in her diagnosis of Fibromyalgia". (Tr. 611). She reported receiving Roxiet from her primary care physician after her rheumatologist refused to provide it for her. (Tr. 611). During her physical examination, Plaintiff was counseled about the harmful effects of narcotic painkillers and their lack of benefit for conditions such as Fibromyalgia. (Tr. 611). Plaintiff insisted she would not stop taking the medication "no matter what this doctor said" and deemed the meeting with this internist "a waste of time." (Tr. 611). Plaintiff was also counseled against taking Ambien, but she insisted she needed it even though she told the doctor multiple times that she "was sleeping 'great'".

11

(Tr. 611). Plaintiff did not exhibit any suicidal or aggressive behavior during hospitalization and insisted she was well. (Tr. 611).

Dr. S. Erfan Ahmed reported Plaintiff did not have any major mental illness, but might have an adjustment or personality disorder. (Tr. 611). Upon discharge, Dr. Ahmed diagnosed depressive disorder and assessed a GAF score of 60-70, indicating mild symptoms. (Tr. 612). Plaintiff was instructed to follow-up with Nurse Snider-Fuller and abstain from all controlled substances, but Plaintiff declined to agree with the latter recommendation. (Tr. 612).

ALJ's Decision

In his decision dated September 1, 2011, the ALJ found Plaintiff could perform light work with restrictions. (Tr. 16). The ALJ followed the process required to evaluate Plaintiff's pain and found her statements regarding functional limitation were not substantiated by the objective medical evidence. (Tr. 16). The ALJ gave "little weight" to Dr. Smith's opinion, explaining it was not supported by the record as a whole or by Dr. Smith's own objective findings. (Tr. 18). The ALJ gave Nurse Snider-Fuller's opinion "little weight", except for her conclusion Plaintiff had the ability to perform simple jobs. (Tr. 19). The ALJ also found Plaintiff's testimony not fully credible. (Tr. 19). Specifically, the ALJ took issue with Plaintiff's refusal to take a drug screen when requested and her claim that Dr. Smith's restrictions were based on "objective findings" when no such testing was recorded in the medical record. (Tr. 19). The ALJ determined Plaintiff had the following RFC:

> [Plaintiff has the ability to perform light work] except she is limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; she must avoid frequent exposure to hazards such as moving machinery and unprotected heights, and she is limited to a job with one and two step tasks.

(Tr. 16).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.     Was claimant engaged in a substantial gainful activity?

13

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.   *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ failed to accurately assess her pain, and in turn her credibility. (Doc. 15, at 6). Plaintiff also argues the ALJ failed to properly evaluate the opinions of treating physicians Drs. Smith and Johnson/Nurse Snider-Fuller. Specifically, she argues the ALJ erred by rejecting these opinions and relying on non-examining sources. (Doc. 15, at 11).

*Fibromyalgia and Credibility*

The Sixth Circuit recognizes that pain alone may be disabling.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's own testimony

14

regarding her pain. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186.  For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; and 2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). This standard, as Plaintiff points out, does not require "objective evidence of the pain itself." *Duncan v. Sec'y of Health & Human Servs*, 801 F.2d 847, 853 (6th Cir. 1986).

Fibromyalgia is a unique condition "marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n.3 (6th Cir. 2007) (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). CT scans, x-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromayalgia] or its severity." *Id. See also Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion". *Id.* at 818. However, as unique as fibromyalgia may be, it does not carve out an exception to the Social Security Act's mandate that "[a]n individual's statement as to pain or other symptoms shall not alone be

15

conclusive evidence of disability". 42 U.S.C. § 423(d)(5)(A).

The ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40. Given the lack of objective tests to confirm the severity of fibromyalgia, these factors play an important role. However, "[t]he mere diagnosis of fibromyalgia, coupled with allegations of disabling subjective limitations, does not, *ipso facto*, require an ultimate finding of disability." *See Cooper v. Astrue*, 2010 WL 5557448, at *4 (W.D. Ky. 2010). Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The Court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

The ALJ in this case cited the appropriate regulations and guidelines governing pain assessment – 20 C.F.R. § 404.1529 and § 416.929  and SSRs 96-4p and 96-7p. (Tr. 16). The ALJ then summarized Plaintiff's testimony, including that about her pain, and concluded: "I find that the

16

claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are not inconsistent with the [] [RFC] assessment." (Tr. 16-17). *Duncan*, 801 F.2d at 853.

The ALJ considered the factors required by 20 C.F.R. §§ 404.1529 and 416.929 and then discussed Plaintiff's daily activities and her testimony about symptom intensity.  (Tr. 25). He specifically noted Plaintiff failed to take a work-ordered drug test but denied abusing prescription medication and falsifying Dr. Torregrosa's prescription. (Tr. 19).  The ALJ also pointed to inconsistencies in the record to support his conclusion that Plaintiff's subjective complaints were not fully credible. *See* SSR 96-7p, 1996 WL 374186,*5 ("One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record."). For example, the ALJ noted Plaintiff testified that Dr. Smith's limiting restrictions were based on "objective findings" and tests conducted in Dr. Smith's office, but no testing was recorded in the medical record. (Tr. 19). The ALJ also noted the medical evidence did not support Plaintiff's testimony that she could not work fifteen to seventeen days out of the month. (Tr. 19).

Here, the ALJ met his duty when assessing Plaintiff's pain, and substantial evidence supports his finding. Treatment notes frequently indicated Plaintiff's pain symptoms were managed by medication and exercise. (Tr. 460, 470, 473, 467, 477, 510, 569). Moreover, Dr. Ballou noted Plaintiff was functional with fibromyalgia flare-ups. (Tr. 467). Despite claims of severe pain, Plaintiff was able to walk a mile – albeit with rest – at least every other day, exercise three to four times per week, cook, perform household chores, drive independently, grocery shop, visit with friends, and ride a mechanical bull. (Tr. 46, 56-61, 253-57, 457). Although Plaintiff reported her

17

pain was 10/10 on one occasion, she indicated she was going on vacation with friends. Further, Plaintiff was counseled against using narcotic painkillers, yet she continually requested them, and either went to different doctors for prescriptions if they were denied or plausibly attempted to fraudulently fill the script herself. (Tr. 366, 403, 413, 481, 514, 549-50, 611). Notably, Plaintiff admitted to seeking the narcotic Roxiet from her PCP after her rheumatologist refused to provide it. (Tr. 611). Plaintiff also stated she would not stop taking narcotic painkillers "no matter what [the] doctor said" and called their meeting a "waste of time". (Tr. 611). Also troubling, as the ALJ pointed out, were Plaintiff's inconsistent reports regarding her refusal to undergo a work-ordered drug screen. (Tr. 19, 402, 431). Accordingly, substantial evidence in the record supports the ALJ's pain and credibility finding.

Plaintiff attempts to persuade the Court she cannot perform any work because she attempted to return to work as a nurse but had to quit due to pain. However, as Plaintiff's own treating source indicated, Plaintiff worked at a very high level in the past, and the ALJ correctly concluded she could no longer perform her past relevant work. (Tr. 20, 538). Suitably, the ALJ considered the functional limitations fibromyalgia imposed and properly found Plaintiff could perform work at a much lower exertional level. (Tr. 16).

*Treating Physicians*

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical

findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242; see 20 C.F.R. § 416.927(c)(2). A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id*. (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a  treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 416.927(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. § 416.927(c)(2)-(6);  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. An ALJ"s reasoning may be brief,  *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the

19

agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

Plaintiff concedes that the ALJ addressed the opinions of Drs. Smith and Johnson/Nurse Snider-Fuller but found them not supported by the record or their own treatment records. (Doc. 15, at 11). Ultimately, Plaintiff argues the ALJ's treatment of these opinions was not supported by the evidence. (Doc. 15, at 11).

*Dr. Smith*

Plaintiff argues Dr. Smith's opinion demonstrated that as a result of pain, Plaintiff was disabled. (Doc. 15, at 12). As support, she notes Dr. Torregrosa's diagnosis of fibromyalgia. (Doc. 15, at 12). However, as noted above, a diagnosis of fibromyalgia, without more, does not entitle a claimant to disability benefits. As the Sixth Circuit has said: "[A] diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Rogers*, 486 F.3d 234; *Preston*, 854 F.2d 815).

The ALJ explained he relied on opinion evidence from state agency physician Dr. Schlag because it was consistent with the record as a whole. The undersigned agrees. Dr. Schlag found Plaintiff could perform light exertional work with additional restrictions. As the ALJ pointed out, Dr. Smith's assessment included limitations far more restrictive than her own treatment notes provided. For example, Dr. Smith limited Plaintiff to walking or sitting no more than one hour in an eight-hour workday despite treatment notes indicting her pain was managed by medication and

20

frequent exercise. (Tr. 467, 469, 470, 546-47). Moreover, the ALJ reasonably accorded little weight to Dr. Smith's opinion that Plaintiff had manipulative limitations due to wrist cramps and shoulder pain because Dr. Smith did not provide any objective or clinical findings to support her opinion. (Tr. 18). As described in the credibility section, despite claims of severe pain, Plaintiff was able to walk a mile at least every other day, exercise three to four times per week, cook, perform household chores, drive independently, grocery shop, visit with friends, and ride a mechanical bull. (Tr. 46, 56-61, 253-57, 457). The record simply does not reflect limitations more severe than imposed by the ALJ's RFC.

*Nurse Snider-Fuller* & *Dr. Toni Johnson*

In addition, Plaintiff argues the ALJ erred by not giving Dr. Johnson/Nurse Snider-Fuller's opinion controlling weight because treatment notes reflected ongoing struggles related to Plaintiff's mental impairments, including poor concentration, poor recent memory, and mood swings. (Doc. 15, at 13). Plaintiff further argues non-examining physicians cannot constitute substantial evidence to support a decision finding an individual not disabled. (Doc. 15, at 13). Not so.

The ALJ was justified in relying on state agency psychological consultants because they are experts in the evaluation of medical issues in disability claims. 20 C.F.R. § 404.1527(e); SSR 96-6p. The ALJ is required to consider and entitled to rely on their opinions based on the same regulations used to assess other medical opinions. 20 C.F.R. § 404.1527(e). Moreover, the ALJ correctly discounted Nurser Snider-Fuller's opinion, except that Plaintiff had the ability to perform simple jobs. (Tr. 19). Nurse Snider-Fuller's treatment notes reflected Plaintiff was a "people person" and a "go-getter." (Tr. 503). Indeed, Plaintiff's GAF score improved from a 51-60 to 60-65 – moderate to mild – in one year and Plaintiff exhibited improved mood, motivation, and concentration. (Tr.

21

584-85). Plaintiff did experience worsening depressive features related to the end of her long-term relationship, but in March 2010, Plaintiff reported she had not been depressed and felt good most of the time. (Tr. 473). In addition, in May 2010, Nurse Snider-Fuller noted Plaintiff was in a fairly good mood and had a vacation planned with friends. (Tr. 462).

Contrary to Plaintiff's assertion, consultive examiner Dr. Bonanno's report does not support a finding that Plaintiff is disabled. Dr. Bonanno noted Plaintiff became tearful when discussing her boyfriend, and found Plaintiff to be anxious and emotionally overwhelmed but motivated with fair self-esteem. (Tr. 431-34). Dr. Bonanno's report did not state, or otherwise indicate, Plaintiff had disabling depressive symptoms.

Consistent with all of this, Plaintiff's testimony and disability reports submitted to the SSA indicate she was not totally disabled. Plaintiff could exercise, cook, perform household chores, drive independently, grocery shop, and visit with friends. (Tr. 46, 56-61, 253-57, 457). Consequently, substantial evidence supports the ALJ's finding that Plaintiff's fibromyalgia, depression, or headaches have not disabled her.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI and DIB benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).